**RECORD IMPOUNDED**

---

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

---

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2047-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MICHAEL WING,

      Defendant-Appellant.

_____

Submitted March 17, 2021 – Decided June 1, 2021

Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 13-10-1340.

Joseph E. Krakora, Public Defender, attorney for appellant (Monique Moyse, Designated Counsel, on the brief).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Michael Wing was indicted on charges of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). He entered a negotiated guilty plea to the sexual contact charge in exchange for the State's dismissal of the endangering count and recommendation of an eighteen-month sentence consecutive to the one he was then serving. Defendant admitted that while incarcerated at the New Jersey Training School for Boys in Jamesburg in August 2013, he forced onto his penis the hand of a fourteen-year-old boy. Defendant was then twenty-two. The State had provided defendant in discovery a video allegedly capturing the offense.

Defendant signed plea forms advising him he could be civilly committed for life upon completion of his term of incarceration. The judge also addressed the possibility of civil commitment with defendant during the plea colloquy pursuant to State v. Bellamy, 178 N.J. 127, 139 (2003) (holding "[t]he failure of either the court or defense counsel to inform defendant that a possible consequence of a plea to a predicate offense under the [Sexually Violent Predator] Act is future confinement for an indefinite period deprives that defendant of information needed to make a knowing and voluntary plea"). The

plea transcript reflects their broader exchange regarding the plea forms defendant signed.

> THE COURT: Mr. Wing, I have a plea form in front of me and the plea form talks about you entering a guilty plea to the fourth degree crime of criminal sexual contact in Count 2. The max anybody can get on a fourth degree in the State of New Jersey is 18 months; and the maximum fine, but it's not a mandatory fine, it's $10,000. I'm not gonna hit you with that, I'm hitting you with the minimum fines. Do you understand that?
>
> DEFENDANT: Yes.
>
> . . .
>
> THE COURT: The next page says are you presently serving a custodial sentence on another charge?
>
> DEFENDANT: Yes.
>
> THE COURT: And do you understand that a guilty plea may affect your parole eligibility?
>
> DEFENDANT: Yes.
>
> THE COURT: Now, important, the more serious charge will be dismissed at the time of sentencing and your plea bargain says 18 months consecutive to the bid that you're doing right now having to do with prior aggravated sexual assaults, correct?
>
> DEFENDANT: Yes.
>
> THE COURT: Now, so we're on the same page, Megan's Law applies, Megan's Law applies — do we have to do the forms and everything here?

A-2047-19

THE PROSECUTOR: Yes, we did the supplemental form that we saw that dealt with that type of thing.

THE COURT: Okay.

THE PROSECUTOR: I don't know if there's an additional one.

THE COURT: I don't know either. Parole supervision or anything comes into play?

THE PROSECUTOR: We checked the parole supervision for life statute. I don't see that the statute falls under it —

THE COURT: All right.

THE PROSECUTOR: — aggravated criminal sexual contact

THE COURT: Right, because it's a fourth degree. But Michael Wing, you know about Megan's Law, right?

DEFENDANT: Yes.

DEFENSE COUNSEL: He's on it.

THE COURT: Right, because you're on it, that's exactly right. So this is just a continuation of your responsibilities under what you already are under which is Megan's Law, correct?

DEFENDANT: Yes.

. . .

THE COURT: Is he forcing you, [Defense Counsel] forcing you or threatening you to plead guilty?

4

DEFENDANT:  No.

THE COURT:  Are you satisfied with him as your lawyer?

DEFENDANT:  Yes.

THE COURT:  Michael Wing, so far you have any questions?

DEFENDANT:  No.

THE COURT:  You could talk to me, you know.  I've been hanging out with you for the last hour, haven't I?

DEFENDANT:  You did.

THE COURT:  That's all right, as long as you're good, but I'm here for you to break it down.  That form was the appeal rights form.  I'll talk about that at the time of sentencing, and I'll go over it.  This one says you're doing a bid — it really doesn't apply, other than say by happenstance they kick you out of the jail that you're in and you post bail on this case and you get out of jail, this form says you understand I'm gonna give you a court date and you better be here for that court date if you're not locked up.  That's what that's all about, do you understand that?

DEFENDANT:  Yeah.

THE COURT:  And then this is the Megan's Law form, and I'll just do it one more time.  Megan's Law, Michael, it's all about knowing where you're at.  It's forcing you to do something responsible by letting everybody know where you're at and the problems that you can confront or face if you don't take care of

5

A-2047-19

business, that the law hits you with the possibility of getting more punishment. So it's real simple, right?

DEFENDANT: Yeah.

. . .

THE COURT: Civil commitment, Michael, we'll talk about too now. Do you understand that if you're convicted of this criminal sexual contact, and there's a specific finding on the record that based on the circumstances of the case this offense should be considered a sexually violent offense, you may upon completion of your term of incarceration be civilly committed to another facility for up to life if the court finds, after a hearing; that you are in need of involuntary civil commitment. Do you understand that?

DEFENDANT: Yes.

THE COURT: But it's real simple. One of us judges are part of that whole — they just can't do that to you. They have to do a real serious court hearing on even trying to do that to civilly commit you; you understand that? So you have rights, they can't just do that to you; do you understand that?

DEFENDANT: Yes.

Two things of note occurred at defendant's sentencing. First, the judge addressed with defendant his account of the offense in the presentence report. That report was not made a part of the record on appeal, and we are thus unaware of its contents. And second, defendant addressed what he believed would occur

6

at the end of his eighteen-month sentence.  The transcript reflects the following colloquy.

> THE COURT:  I read the Presentence Report last night.  And when I got to page three, more particularly, in the defendant's version, the defendant stated he does not admit doing anything.  That was a denial I thought.
>
> And so the first thing I needed to do was try to correct it or not try; correct it so that I'm not sentencing an innocent man to State Prison.  That's the most important thing.
>
> . . .
>
> THE COURT:  Mr. Wing, you have now been sworn again under oath.  Mr. Wing, do you want to correct that statement?
>
> DEFENDANT:  Yes.
>
> THE COURT:  What do you want to say, sir?
>
> DEFENDANT:  That what was said was not actually true.  I did make him do the things I said I did.
>
> THE PROSECUTOR:  Which is what?
>
> DEFENDANT:  Forced him to touch my penis.
>
> THE PROSECUTOR:  And you know [the victim] is 14?
>
> DEFENDANT:  Yes.
>
> THE PROSECUTOR:  Okay. And you forced him to put his hand on your penis?

DEFENDANT: Yes.

THE PROSECUTOR: And that's the truth?

DEFENDANT: Yes.

THE PROSECUTOR: Okay.

DEFENSE COUNSEL: And that's what you were telling the court on the day of your guilty plea. Correct?

DEFENDANT: Yes.

THE PROSECUTOR: Just out of curiosity, why did you tell the Reporter that you didn't do it or you didn't admit to doing anything wrong?

DEFENDANT: Because I don't like telling my business to anyone.

DEFENSE COUNSEL: Were you embarrassed?

DEFENDANT: Basically.

THE COURT: Good reason.

THE PROSECUTOR: Okay.

DEFENSE COUNSEL: Judge, I would ask the court to adopt the negotiated plea, make the correction on page three. My client is serving a sentence right now. Apparently, he's not entitled to any jail time or gap time credit. This actually happened while in custody. I'm going to ask the court to sentence him to 18 months consecutive. Thank you.

A-2047-19

. . .

THE PROSECUTOR: Obviously, you read the Presentence Report.

. . .

THE PROSECUTOR: And, you know, when you look at Mr. Wing, he actually seems like a likeable, pleasant person; but if you look at his prior history and the fact that he was in a facility when he did this, incarcerated when he did this, you see that there's a pattern, obviously, of him doing this type of conduct. So there's a risk that he will commit another offense, obviously. He has a prior record, so aggravating factors three and six apply; and then there is a need to deter Mr. Wing and others from committing this type of conduct again or any illegal conduct.

Three, six and nine are factors that apply. I don't think any mitigating factors apply. We worked out this plea so he could plead to the fourth degree, not the third degree; so it's a fourth-degree sexual contact conviction, only 18 months incarceration, consecutive. We think that's a fair resolution. Thank you.

THE COURT: Thank you. Mr. Wing, you have a right to speak. And for your benefit, I did read the Presentence Report and you've had it rough. When the defendant tells me that they had the worst childhood, I could understand why you would say that based upon me reading the Presentence Report.

But, Mr. Wing, and it's my understanding that you're looking forward to going to Avenel so they can deal with this issue.

DEFENDANT: I'm already there.

9

THE COURT: You're there?

DEFENDANT: Yes.

THE.COURT: Mr. Wing, you have a right to say something. What do you want to say, sir?

DEFENDANT: I don't know. I just want to thank you for your decision that you made. When this 18 months is finished, I'll be heading — I'll come home, been going since I was 16; do my time, do my time. That's the way I see it.

The judge found aggravating factors three, the risk defendant would commit another offense, N.J.S.A. 2C:44-1(a)(3), and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). He declined to find aggravating factor six, the extent of defendant's prior criminal record and seriousness of the offenses of conviction, N.J.S.A. 2C:44-1(a)(6). The judge found no mitigating factors. He dismissed the third-degree endangering charge in accordance with the plea agreement and sentenced defendant to eighteen months in State prison on the fourth-degree criminal sexual contact charge, consecutive to the sentence defendant was then serving. Four months later, the judge amended the judgment of conviction to find defendant's "conduct was characterized by a pattern of repetitive and compulsive behavior," that he was amenable to sex offender treatment and was to comply with Megan's Law.

10

Defendant did not file a direct appeal of his sentence. Three-and-a-half years later, after being civilly committed to the Special Treatment Unit as a sexually violent predator pursuant to the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to -27.38,[1] defendant filed a pro se Post Conviction Relief (PCR) petition contending he would not have pleaded guilty but for his attorney's ineffective assistance. Specifically, defendant averred he told his attorney he "did not do the offense," and that the two had watched the video together, which defendant claimed "shows [he] didn't do anything." He also maintained he would not have pleaded guilty had his attorney advised him "about civil commitment." Defendant contended his lawyer "did not speak with [him] about it." Defendant acknowledged the judge addressed it, saying he told him a "little," but claimed he "thought it didn't apply to [him], because [his] attorney didn't tell [him] about civil commitment."

---

[1] In addition to not having been provided the presentence report, we were not provided the State's petition for civil commitment or the judgment declaring defendant a sexually violent predator, although the record appears to indicate the judge reviewed all three before rendering a decision in this matter.

A-2047-19

Defendant was appointed counsel, who apparently filed an amended petition and a supplemental certification by defendant,[2] which was eventually heard by the same judge who took his plea. The supplemental certification fleshes out the averments in defendant's original petition. In it, defendant asserted that prior to entering the plea, he and his attorney reviewed the video the State intended to rely on at trial, which defendant again claimed "did not show [him] doing anything wrong." Defendant insisted he told his lawyer he was innocent and did not want to plead guilty. He claimed, however, his lawyer "insisted that going to trial was not possible in this case because [defendant] would most certainly lose," and that after several such discussions he "felt as if [he] had no choice but to plead guilty," because his attorney would "never have defended [him] at trial."

Defendant acknowledged his lawyer reviewed a plea form with him before he entered his plea, but maintained the lawyer "never explained to [him] that [he] could be civilly committed after [he] finished [his] sentence. More importantly, [counsel] never told [him] that [he] could be committed for the rest of [his] life." Defendant claimed the first he heard about civil commitment was

---

[2] We say apparently because the copy of the amended petition in the appendix is unsigned and undated and the supplemental certification, while signed, is also undated. Neither document bears a file stamp.

12

from the judge during the plea colloquy. Defendant averred the judge "explained to me that I would not face such a penalty because my plea was only to fourth degree contact. According to what the court told me, I understood a penalty like that would only apply to other serious offenders and not to me." Defendant claimed that had he known "civil commitment was a possibility, [he] never would have entered a guilty plea in this case" because he was innocent of the offense "and . . . would have taken [his] case to trial."

Defendant's counsel filed a brief in support of the amended petition arguing that the trial "court's description of the consequences" defendant "faced and the standard for the possibility of a civil commitment were incorrect, misleading and failed to underscore the true consequences" to defendant. Specifically, counsel argued the "legal standard from the plea form," that the judge read to defendant "was completely negated" by the court's further comments. Counsel claimed the judge's advice to defendant about civil commitment was "they can't just do that to you," when "[i]n fact, they can." He argued that statement was "clearly meant to lessen the blow of what is undeniably a substantial punishment. By making this statement, the court states directly that the courts cannot do what the paragraph in the plea form says they can do."

Defense counsel continued the argument, quoting the judge's statement to defendant that "[t]hey have to do a real serious hearing on even trying to do that." Counsel rhetorically asked, "[w]hat is a 'real serious hearing' as opposed to any other hearing before the court?" Counsel claimed the "implication is that such a hearing would be even more 'serious' than" the hearing the court was conducting to accept defendant's guilty plea. Counsel argued the judge was telling defendant "these things in order to ease his mind and assure him that such a serious hearing would protect him from being civilly committed," which was not true.

Arguing the judge "hammer[ed] the point home even further," by telling defendant "you have rights, they can't just do that to you," counsel contended the remarks had the effect of assuring defendant "that even though [civil commitment] sounds like a possibility, [defendant's] 'rights' would prevent that from ever happening." Counsel argued, as he did at oral argument before the judge on the petition, that the way the court worded the advice to defendant required by Bellamy, looked at from defendant's perspective, implied to him that the prospect of civil commitment was "something that's . . . extremely difficult and something that he wouldn't even have to worry about because he's pleading guilty to a fourth-degree contact, not the third-degree endangering."

In response, the judge asked counsel whether he found the language "that way." When counsel replied he did, the judge stated, "I didn't mean it that way." The judge stated he "wasn't minimizing" the risk of civil commitment to defendant by those remarks, but intended "to convey the opposite." The judge explained he was "actually trying to enhance" for defendant the seriousness of the threat, as he saw civil commitment as "much more serious" than defendant's eighteen months in State prison for a fourth-degree crime.

Defense counsel countered, respectfully, that "the opposite is true," it is "the conviction itself is what is very influential to [the SVP] court." He argued what the court should have underscored for defendant was that it was the plea colloquy defendant was engaged in that was important. "[T]he guilty plea itself is what makes the decision so serious. That's what he wasn't told. And this is the opposite of that . . . . He should have been told specifically, you pleading guilty to this makes it serious." Counsel argued the court told defendant "they can't just do that to you," but, in fact, "they can and they did. That's exactly what they did. They took this guilty plea . . . and that's what they used to civilly commit him. So when you say, well, they have to do a serious hearing, no, they seriously look at the conviction [defendant] pled guilty to."

A-2047-19

Although not having filed a motion to permit defendant to withdraw his plea, counsel's main argument to the court was that its remarks during the plea colloquy misinformed defendant about the real risks of civil commitment inhering in the plea, thereby depriving him of critical information necessary for its knowing and voluntary entry under Rule 3:9-2. Counsel also argued defendant was entitled to an evidentiary hearing on his claims his counsel never discussed civil commitment with him and pressured him into pleading guilty, notwithstanding defendant's insistence of his innocence.

The judge acknowledged in the course of the argument he had not seen many cases in which a defendant's guilty plea to a fourth-degree offense precipitated the State's petition for civil commitment, and that he did not know "why they did this to [defendant]." When counsel asked to be allowed to submit the civil commitment documents if the court was "concerned about the precise reasons" for defendant's commitment, the court advised he had already requested the file and would "get it today." At the conclusion of the argument, the judge advised he wanted to review the transcript again and would send the parties his decision.

The judge issued his written decision more than six months later. After fairly detailing defendant's contentions and the applicable law, the judge

16

concluded he properly instructed defendant about the possibility of civil commitment under <u>Bellamy</u>. Specifically, the judge found

> defendant was told that although he does have constitutional rights, he was advised that he could be civilly committed following a serious court proceeding. The defendant was not misled by the court, nor was the possibility of civil commitment diminished by the court's instruction. The defendant acknowledged he understood this before the guilty plea was accepted.

As to the ineffective assistance claim, the court found defendant failed to demonstrate his counsel was ineffective under the first prong of the <u>Strickland</u>[3] standard. The judge found

> [p]lea paperwork shows that counsel underlined the civil commitment portion of the forms. The defendant was asked whether any other promises were made to him in connection with the plea to which he stated none were. The defendant was also asked if he was satisfied with his attorney and indicated he was. There is no evidence to support the defendant's claims that trial counsel was ineffective and forced him to take a plea.

Defendant appeals, contending

> MR. WING IS ENTITLED TO AN EVIDENTIARY HEARING ON HIS CLAIM THAT HIS ATTORNEY RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO INFORM HIM ADEQUATELY OF THE CIVIL COMMITMENT CONSEQUENCES OF HIS PLEA, AND BY PRESSURING HIM INTO PLEADING GUILTY. IN

---

[3] <u>Strickland v. Washington</u>, 466 U.S. 668, 693-94 (1984).

THE ALTERNATIVE, HE SHOULD BE ALLOWED TO WITHDRAW HIS PLEA AS IT WAS NOT KNOWING OR VOLUNTARY DUE TO DEFENSE COUNSEL'S LACK OF ADVICE AND THE TRIAL COURT'S MISADVICE REGARDING CIVIL COMMITMENT.

Although defendant did not make a formal motion to withdraw his plea based on what he claims was misinformation by the trial judge as to the risk of civil commitment, we have no doubt it was central to his claim that both his counsel and the court failed to correctly advise him of the plea's consequences, precluding a finding the plea was entered knowingly and voluntarily under Rule 3:9-2.

An application to withdraw a plea and a claim of ineffective assistance of counsel although often related, as these were, are distinct and must be analyzed separately because they are governed by different rules, judged under different standards and are grounded in different clauses of the constitution. State v. O'Donnell, 435 N.J. Super. 351, 368-69 (App. Div. 2014). A motion to withdraw a plea is governed by the four-factor Slater[4] test, while an ineffective assistance of counsel claim is governed by the two-prong Strickland standard. The claims are ordinarily also subject to different standards of review. While a

---

[4] State v. Slater, 198 N.J. 145, 157 (2009).

A-2047-19

decision on a plea withdrawal motion is ordinarily reviewed only for an abuse of discretion, State v. Simon, 161 N.J. 416, 444 (1999), a court's failure to have analyzed the claim under the correct test will trigger de novo review, see Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (explaining the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference"); cf. State v. Green, 236 N.J. 71, 81 (2018) (noting "appellate review is de novo when the court should have, but did not perform a [State v.]Cofield,[5] analysis").

Similarly, while our review of a PCR court's fact findings following the taking of testimony is "necessarily deferential," State v. Nash, 212 N.J. 518, 540 (2013), "in the absence of an evidentiary hearing, a reviewing court may exercise de novo review of 'the factual inferences drawn from the documentary record,'" State v. Hooper, 459 N.J. Super. 157, 180 (App. Div. 2019) (quoting State v. Harris, 181 N.J. 391, 421 (2004)). Because the court did not analyze defendant's claim that he was misadvised as to the consequences of his plea by the court under Slater, perhaps owing to counsel's failure to make a formal motion to withdraw the plea, and did not conduct an evidentiary hearing on his ineffective assistance claim, our review of both is de novo. See Harris, 181 N.J. at 415

---

[5] 127 N.J. 328, 338 (1992).

(noting a reviewing court is not bound by and gives no deference to the legal conclusions of the trial court).

Applying those principles here, we conclude the appropriate course is to vacate the trial court's decision and remand for an evidentiary hearing on defendant's claims. As our Supreme Court has noted, "[o]ur system of criminal justice is not infallible." Nash, 212 N.J. at 540. Having reviewed the transcript of the plea colloquy, which we have quoted at length, we have no doubt the judge conscientiously attempted to explain to defendant, in language defendant could understand, he faced indefinite civil commitment as a collateral consequence of his plea to fourth-degree criminal sexual contact for which he was to serve eighteen months. But we also do not find implausible defendant's claim that he understood that explanation to mean "a penalty like that would only apply to other serious offenders and not to [him]."

Although the transcript of the PCR proceeding makes clear the court heard and considered defense counsel's arguments that the court's own remarks to defendant during the plea colloquy, which defendant claimed was his only advice on those collateral consequences, misled him about the risk of civil commitment inhering in the plea, and it was concerned enough about what occurred to review the file of the civil commitment proceeding before rendering

20

a decision,[6] that consideration is not reflected in the court's written opinion issued six months later. There, the court only perfunctorily concluded that "defendant was not misled by the court, nor was the possibility of civil commitment diminished by the court's instruction." Why the court came to that conclusion, viewing defendant's averments, as required, in the light most favorable to him, State v. Preciose, 129 N.J. 451, 462-63 (1992), is not explained.

Further, while it is clear that someone underlined criminal sexual contact on the supplemental plea form question about civil commitment, defendant acknowledged his counsel reviewed the plea form with him. That fact does not establish that defendant's claim that his counsel never explained he could be civilly committed for the rest of his life by pleading guilty to this fourth-degree offense is false.

---

[6] We have already remarked about the documents not included in the appendix. Although we see no error in the PCR court's desire to review the civil commitment here, counsel or the court should have made the petition and the judgment, or whatever other documents the court reviewed, a part of this record. The court should not review or rely on any documents in rendering its decision it does not make part of the record. See N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 264 (App. Div. 2002) (noting a trial judge's review of documents not made part of the record deprives a reviewing court of a complete record on appeal, inhibiting the appellate process).

The court was incorrect to find there was "no evidence to support defendant's claims that trial counsel was ineffective and forced him to take a plea." Defendant's certification made on personal knowledge is evidence. Moreover, certain statements by defendant at the time of these events, his refusal to admit guilt when interviewed for the presentence report and his statement at sentencing thanking the court and saying he would be heading home "[w]hen this 18 months is finished," lend some credibility to his claims.

To be clear, we do not suggest by our discussion that defendant has established his plea was not knowing and voluntary under Rule 3:9-2, or that he received less than competent representation or was in any way prejudiced by the representation he received. We conclude only that he has established the right to present his claims at an evidentiary hearing and have the court consider them under Slater and Strickland.

In order to permit the court to consider defendant's claim that he was misinformed about the collateral consequences of his plea, defendant should be accorded the opportunity to file a properly supported motion to withdraw his plea on remand. If, after hearing the evidence, the court is satisfied defendant did not understand the consequences of his plea, or would not have pleaded

22

guilty had his counsel properly advised him of the risks of civil commitment, it shall permit defendant to withdraw his plea and reinstate the charges.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2047-19